IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 1, 2023

### IN RE KENNETH D.

**Appeal from the Chancery Court for Warren County**
**No. 707-A          Larry B. Stanley, Jr., Chancellor**

———————————

### No. M2022-01466-COA-R3-PT

———————————

In this case involving termination of the father's parental rights to his child upon a petition filed by the child's mother and stepfather, the trial court determined that five statutory grounds for termination had been proven by clear and convincing evidence. The trial court further determined that clear and convincing evidence demonstrated that termination of the father's parental rights was in the child's best interest. Following the father's initial appeal, this Court vacated the trial court's judgment and remanded for entry of specific findings of fact and conclusions of law pursuant to Tennessee Code Annotated § 36-1-113(k). On remand, the trial court entered a judgment confirming its prior determinations with added specific findings and conclusions. The father has again appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J, delivered the opinion of the court, in which FRANK G. CLEMENT, JR, P.J., M.S., and ARNOLD B. GOLDIN, J, joined.

Daniel L. Graves, II, Murfreesboro, Tennessee, for the appellant, Kenneth D., II.

Nathan S. Luna, Murfreesboro, Tennessee, for the appellees, Angeline S. and David S.

### OPINION

#### I. Factual and Procedural Background

This case focuses on Kenneth D., III, the minor child ("the Child") of Kenneth D., II ("Father"), and Angeline S. ("Mother") upon a petition to terminate Father's parental rights filed by Mother and her current husband, David S. ("Stepfather"). This case was previously before this Court on appeal in *In re Kenneth D.*, No. M2021-00214-COA-R3-

PT, 2022 WL 556739 (Tenn. Ct. App. Feb. 24, 2022) ("*Kenneth D. I*"). In *Kenneth D. I*, this Court set forth the factual and procedural background leading to the trial court's initial judgment terminating Father's parental rights to the Child and Father's first appeal as follows:

In 2015, Angeline S. ("Mother") and Kenneth D. ("Father") divorced, three years after the birth of their son, Kenneth. As part of their divorce, the court approved a permanent parenting plan naming Mother as the primary residential parent but granting Father 160 days of parenting time. That plan proved to be short lived.

The following year, upon the petition of the Tennessee Department of Children's Services, a juvenile court found Kenneth to be dependent and neglected. Specifically, the court found the child to be the victim of severe child abuse at the hands of Father. The severe abuse involved the discharge of a handgun. Mother retained custody of the child, but the court restrained Father from having any contact with the child other than therapeutic visitation. In February 2017, the juvenile court terminated Father's visitation altogether.

In the meantime, Mother married David S. ("Stepfather"). In April 2019, Stepfather, joined by Mother, petitioned to terminate Father's parental rights and to adopt Kenneth. The petition alleged six grounds for termination: abandonment by failure to visit; abandonment by failure to support; persistence of conditions; severe child abuse; mental incompetency and inability to care for the child; and failure to manifest an ability and willingness to assume custody and financial responsibility of the child.

At the trial on the petition, Mother, Father, Father's half-sister, and the child's paternal grandmother testified. Mother testified that Father had not visited his child since Father's visitation was terminated in February 2017. Mother was aware that Father had tried "to pursue some form of custody in November of 2018." And the parties stipulated that Father had petitioned another court to modify the parenting plan in November 2018. But the court where Father filed the petition determined that it did not have jurisdiction.

Mother also testified that she never received any child support from Father. On cross-examination, she acknowledged that, at the time of the divorce, she agreed with Father that neither would pay child support. And when Father's visitation was terminated in November 2017, Mother declined

to pursue child support. As far as she was concerned, she did not want "anything to do with any of that," and she "was very capable of taking care of [her] son." Beyond being capable of supporting the child on her own, Mother wanted no assistance from Father. Mother was aware that her son might be entitled to federal benefits through Father, but she "never pursued it, because, once again, . . . [she] didn't need any extra help financially taking care of [her] son."

Mother described Father as irresponsible, unpredictable, and violent. He had abused drugs, specifically opioids. And Mother feared for her safety when she lived with Father. She recalled an argument that turned violent. After Mother confronted Father over money that was missing from her bank account, Father kicked Mother in the head, dragged her off by her hair, pushed her up against the wall, and choked her in the presence of the child.

But Mother conceded she had not seen Father in several years. Father had been restrained from contacting her. And Mother had made efforts to avoid contact by changing her phone number and keeping her personal information private.

Mother was asked if her position regarding termination of rights would change if she learned that Father had made significant changes in his life. She testified that she did not know if she would ever feel safe around Father or that she would ever be comfortable co-parenting with him. Mother explained that she was concerned with Father's drug use and whether or not he was receiving treatment. In her opinion, Father was erratic, had poor impulse control, and was violent.

In his testimony, Father acknowledged that he had not seen his child since 2016. There had been no relationship at all for about four years. Father explained that he was afraid that any attempt he made to contact his child would jeopardize what contact his half-sister and his mother enjoyed. Mother testified that she allowed Father's half-sister to have overnight, weekend visits "[e]very other week or so" from 2017 until November 2019. But Mother conditioned the visits on Father not being informed of the timing of the visit and on there being no contact with Father while the child was present.

As for support, Father was prepared to support his child. Before his marriage to Mother, Father had served with the United States Marine Corps. He had a 100% service-connected disability rating for which he received

Department of Veterans Affairs benefits. He also received Social Security disability benefits. Father stated that he had provided information to both the VA [Veterans Benefits Administration] and Social Security so that his child could receive benefits and was "confounded" as to why the child was not.

Father lived in Florida, where he shared a home with another veteran he had met through the VA [Veterans Health Administration]. In discussing his time in Tennessee, Father confessed that he had "built a terrible drug habit" and was "just terribly self-destructive." He had "lost the will to live." When asked about past incidents of domestic violence, he apologized and said he "was not in [his] right mind." Father had been diagnosed with post-traumatic stress disorder, traumatic brain injury, depression, bipolar disorder, and anxiety.

To escape the "depression, drugs, and the same old crowd that [he] ha[d] known all of [his] life," Father moved to Florida in 2017. He said "[e]verything seemed to get a little lighter" with the move. And he claimed to have been off pain medication of any sort since November 2019. But Father had been prescribed medical marijuana. When asked if he smoked marijuana daily, Father responded, "Hell, yeah."

Father's half-sister testified to Father's improvement since moving to Florida. She described him as being "a completely different person." Father was "taking care of himself, diet, exercise," and his cleanliness and overall appearance were "just upstanding." He also had his finances in order. She felt like this was "the best time ever for him to have his visitation reinstated." Father's mother, who lived for a time with Father in Florida, believed that the treatment Father had received through the VA had been helpful. When asked to describe the changes to Father since his move to Florida, Father's Mother testified, "Everything ha[d] changed for the good." It was "like night and day to the good part."

*Id.* at *1-2 (footnote omitted). Having determined that the trial court's initial order terminating Father's parental rights lacked sufficient findings of fact and conclusions of law, this Court vacated the trial court's judgment and remanded for entry of specific findings of fact and conclusions of law pursuant to Tennessee Code Annotated § 36-1-113(k) (2021). *Id.* at *8.

On remand, the parties filed a joint motion for instruction with the trial court on March 11, 2022, and subsequently filed agreed findings of fact on September 12, 2022. The trial court entered a final order terminating Father's parental rights to the Child on

September 20, 2022, upon "once again consider[ing] the pleadings, testimony of Mother, Father, Father's half-sister, and child's paternal grandmother, and the entire record to reach a decision." The trial court determined that Mother and Stepfather (collectively, "Petitioners") had proven, by clear and convincing evidence, the statutory grounds of abandonment by failure to visit, persistence of the conditions leading to the Child's removal, severe child abuse, mental incompetence to adequately provide for the further care and supervision of the Child, and failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child. As in its initial judgment, the trial court found that the ground of abandonment through failure to financially support had not been proven by clear and convincing evidence. Applying the statutory best interest factors applicable to the date of the petition's filing, *see* Tenn. Code Ann. § 36-1-113(i) (2017), the trial court further found that Petitioners had proven, by clear and convincing evidence, that termination of Father's parental rights was in the Child's best interest. Father timely appealed.

## II. Issues Presented

Father presents two issues on appeal, which we have combined into a single issue and restated as follows:

> Whether the trial court erred in finding by clear and convincing evidence that termination of Father's parental rights was in the Child's best interest, particularly by declining to attach significant weight to Father's adjustment of circumstances.

On appeal, Father has not challenged the trial court's findings that statutory grounds existed to terminate his parental rights to the Child, and Petitioners have not raised any additional issues. However, this Court must "review thoroughly the trial court's findings as to each ground for [parental rights] termination and as to whether termination is in the child's best interests." *See In re Carrington H.*, 483 S.W.3d 507, 525 (Tenn. 2016). We will therefore consider each of the statutory grounds found by the trial court before proceeding to an analysis of the Child's best interest and Father's specific argument concerning his adjustment of circumstances.[1]

---

[1] Petitioners have not raised an issue regarding the trial court's finding that they failed to prove the statutory ground of abandonment through failure to support by clear and convincing evidence. Although our Supreme Court has instructed that this Court "must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal," *In re Carrington H.*, 483 S.W.3d at 525-26, this Court has not interpreted this instruction "to mean that this Court must also review grounds that the trial court found were not sufficiently proven when the party who sought termination does not challenge that ruling on appeal," *In Re Disnie P.*, No. E2022-00662-COA-R3-PT, 2023 WL 2396557, at *5 (Tenn. Ct. App. Mar. 8, 2023) (quoting *In re C.S.*, No. E2019-01657-COA-R3-PT, 2020 WL 2066247, at *3 (Tenn. Ct. App. Apr. 29,

III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d at 523-24; *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing

2020)). Accordingly, we will not review the trial court's findings as to abandonment through failure to support in this action.

evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

\* \* \*

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

### IV. Grounds for Termination of Father's Parental Rights

Tennessee Code Annotated § 36-1-113 (Supp. 2022) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a)    The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

\* \* \*

(c)    Termination of parental or guardianship rights must be based upon:

(1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)     That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court concluded that the evidence clearly and convincingly supported a finding of five statutory grounds to terminate Father's parental rights: (1) abandonment through failure to visit the Child, (2) severe child abuse, (3) mental incompetence to adequately provide for the further care and supervision of the Child, (4) persistence of conditions leading to the Child's removal, and (5) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child. We will address each statutory ground in turn.

A. Abandonment Through Failure to Visit

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) (Supp. 2022) provides, as relevant to this action:

(g)     Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1)     Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Regarding the definition of abandonment applicable to this ground, Tennessee Code Annotated § 36-1-102(1) (Supp. 2022) defines abandonment in pertinent part as:

(A)(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Additionally, Tennessee Code Annotated section 36-1-102(1)(I) provides:

> [I]t shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure.

Noting the agreed factual finding that Father had not seen the Child since April of 2016, the trial court determined that clear and convincing evidence demonstrated Father's failure to visit the Child during the four months preceding the filing of the termination petition. Although the trial court did not include specific dates, we find that the four-month statutory determinative period for purposes of abandonment by failure to visit or support began on December 8, 2018, and concluded on April 7, 2019, the day prior to the filing of the termination petition ("Determinative Period"). *See In re Joseph F.*, 492 S.W.3d 690, 702 (Tenn. Ct. App. 2016) (explaining that the applicable four-month statutory period preceding filing of the termination petition "began on March 8, 2011, and concluded on July 7, 2011, the day prior to the filing of the termination petition") (citing *In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at \*6 (Tenn. Ct. App. Feb. 20, 2014)). Because we determine that the trial court's findings regarding "the four (4) consecutive months immediately preceding the filing of this Petition" are inclusive of the Determinative Period, we further determine the trial court's omission of specific beginning and ending dates to be harmless error. *See, e.g.*, *In re Ima D.*, No. M2021-00022-COA-R3-CV, 2021 WL 5441832, at \*4 (Tenn. Ct. App. Nov. 22, 2021); *In re Steven W.*, No. M2018-00154-COA-R3-PT, 2018 WL 6264107, at \*12 (Tenn. Ct. App. Nov. 28, 2018).

In this case, after Father had failed to schedule supervised therapeutic visitation with the Child at Kymari House, the facility indicated by the Warren County Juvenile Court ("juvenile court") in a December 2016 order, his rights to supervised visitation were terminated by the juvenile court in February 2017. Although Father did not raise lack of willfulness as an affirmative defense, he has argued within his appellate brief that his failure to visit was not willful in reference to the best interest analysis based on the suspension order. However, the visitation suspension order does not, in itself, excuse Father's failure to visit. *See In re Adoption of Angela E.*, 402 S.W.3d 636, 642 (Tenn. 2013) ("[T]he prior order suspending Father's visitation rights did not preclude a finding that Father willfully failed to visit the children.").

Within his best interest argument, Father also asserts that the failure to visit was not willful because he attempted to petition to reinstate visitation. Father had filed a petition

in November 2018 to amend the order in the Cannon County Chancery Court. However, this petition was dismissed because the court lacked subject matter jurisdiction. Father did not attempt to file a petition to amend the order in the proper court within the Determinative Period, and by the time of the termination petition's filing, he had not seen the Child for approximately three years. In *Adoption of Angela E.*, our Supreme Court held that a father who had been under a court order preventing visitation with his child during the determinative period had abandoned his child under this ground when although he had filed a petition to amend the visitation order, he took no further action to attempt to visit the child. *In re Adoption of Angela E.*, 402 S.W.3d at 642. Similar to Father in this action, the father in *Angela E.* had not exercised any parental time with the child during the three years prior to the date of the termination petition's filing. *Id.*

Here, Father failed to undertake actions that would have allowed him to resume supervised visitation with the Child and failed to visit the Child in a period of time far exceeding the Determinative Period. We therefore conclude that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that Father failed to visit the Child during the Determinative Period. The trial court did not err in terminating Father's parental rights to the Child predicated on this statutory ground.

## B.  Severe Child Abuse

The trial court determined that Petitioners proved the statutory ground of severe child abuse committed by Father by clear and convincing evidence. Tennessee Code Annotated § 36-1-113(g)(4) (Supp. 2022) provides as to this ground:

> The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

Section 37-1-102 defines severe child abuse as:

> (A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death[.]
>
> (ii)  "Serious bodily injury" shall have the same meaning given in § 39-15-402(c)[.]

Tenn. Code Ann. § 37-1-102(b)(27)(A) (Supp. 2022).

In its final judgment, the trial court stated the following specific findings regarding this statutory ground:

> The Court does find that the Mother has proven by clear and convincing evidence that grounds for termination of the Father's parental rights exist based on the Father committing severe child abuse against the child. The Father's actions that constitute severe child abuse against the child were the neglect of the child by allowing the child to handle a pistol, which resulted in the child accidentally shooting the Father. On June 14, 2016, the Juvenile Court of Warren County, Tennessee, found by clear and convincing evidence that the child was a victim of severe child abuse perpetrated by Father. Therefore, the Father's parental rights are terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(4).

In considering this statutory ground, we look to the June 2016 adjudicatory order wherein the juvenile court found by clear and convincing evidence that the Child was a victim of severe child abuse committed by Father pursuant to Tennessee Code Annotated § 37-1-102. This order was based on findings that the Child was given a loaded gun by Father that the Child then discharged, shooting Father. It is well established that a trial court may rely on a prior court order finding severe child abuse as a ground for termination and that the court is not required to re-litigate the issue of severe abuse during the termination trial so long as the prior order is final. *See In re Shyronne D.H.*, No. W2011–00328-COA-R3-PT, 2011 WL 2651097, at *5 (Tenn. Ct. App. July 7, 2011); *State, Dep't of Children's Servs. v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005).

In the case at bar, the record demonstrates that the juvenile court's adjudicatory order finding severe child abuse against Father was final and was not appealed. Therefore, the trial court did not err in relying upon the prior adjudication of severe child abuse in the dependency and neglect proceedings as a ground for termination of Father's parental rights. *See State, Dep't of Children's Servs. v. M.S.*, 2005 WL 549141, at *10 ("The [severe abuse] ground itself is proved by a court order finding severe child abuse, and the issue of whether abuse occurred is not re-litigated at the termination hearing."). We affirm the trial court's judgment that Father committed severe child abuse against the Child pursuant to the definitions of severe child abuse contained in Tennessee Code Annotated §§ 37-1-102(b) and 39-15-402(c).

## C. Mental Incompetence to Adequately Provide for the Further Care and Supervision of the Child

The trial court also found clear and convincing evidence of the statutory ground of Father's mental incompetence to adequately provide for the further care and supervision of the Child. Regarding this ground for termination, Tennessee Code Annotated § 36-1-113(g)(8) (Supp. 2022) provides:

> (8)(A) The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child;

> (B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:

>> (i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and

>> (ii) That termination of parental or guardian rights is in the best interest of the child;

> (C) In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated[.]

The General Assembly's exclusion of willfulness from this statutory ground "serves to protect children from harm caused by a parent who is incapable of safely caring for them." *See In re D.A.P.*, No. E2007-02567-COA-R3-PT, 2008 WL 2687569, at *5 (Tenn. Ct. App. July 9, 2008). If willfulness were required in order to terminate parental rights

- 12 -

for mental incompetence, "an obvious result . . . is to condemn a child, whose parents are unfit to properly care for the child because of mental illness, to a life in serial foster homes without any possibility of a stable, permanent home." *See State, Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990).

This Court has rejected the argument that the ground of mental incompetence is reserved only for parents who have "a condition for which 'no amount of intervention can assist.'" *See In re S.M.R.*, No. M2008-01221-COA-R3-PT, 2008 WL 4949236, at *6 (Tenn. Ct. App. Nov. 18, 2008). This Court has instead affirmed the termination of parental rights when parents have suffered from unalleviated mental disorders such as bipolar disorder, adjustment disorder with anxiety and depressed mood, dependent personality disorder, and schizophrenic disorder. *See e.g.*, *Smith*, 785 S.W.2d at 337-39 (affirming the termination of parental rights of a parent diagnosed with schizophrenic disorder on the basis of mental incompetence although the acts of the mentally disabled parent were not willful); *In re S.M.R.*, 2008 WL 4949236, at *6 (affirming termination of parental rights on the statutory ground of mental incompetence when the parent was diagnosed with bipolar disorder and personality disorder, not otherwise specified); *Dep't of Children's Servs. v. M.R.N.*, No. M2006-01705-COA-R3-PT, 2007 WL 120038, at *10 (Tenn. Ct. App. Jan. 17, 2007) (affirming termination of parental rights on the statutory ground of mental incompetence based on a diagnosis of adjustment disorder with anxiety and depressed mood as well as dependent personality disorder). The parent's mental condition, however, must impair the parent to an extent that he or she cannot adequately provide for the care and supervision of the child. *See* Tenn. Code Ann. § 36-1-113(g)(8)(B)(i).

In its final judgment, the trial court stated the following specific findings of fact regarding this statutory ground:

> The Court does find that the Mother has proven by clear and convincing evidence that grounds for termination of the Father's parental rights exist based on the Father remaining mentally incompetent. The Father is diagnosed with PTSD, traumatic brain injury, depression, bipolar disorder, anxiety, and a history of substance abuse. The Father spoke out while the Mother was on the stand saying, "You've got one shot, make it good." Also, when the Father was on the stand, when asked about his income he said, "I'm an artist, I draw benefits twice a month." Those statements along with the diagnosis indicate the Father remains mentally incompetent and is unable to provide the care and supervision of the child and is so likely to remain so that it is unlikely the Father will be able to resume care and responsibility of the child in the near future. Therefore, the Father's parental rights are terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(8).

Father has a 100% military service-related disability in addition to his diagnoses of PTSD, traumatic brain injury, depression, bipolar disorder, and anxiety, and he has a history of substance abuse. In her testimony, Mother described Father's behavior as irresponsible, unpredictable, erratic, and violent. Father himself testified to the violent domestic abuse Mother suffered at his hands, for which he apologized, stating that he "was not in [his] right mind." Father further explained that the domestic abuse had occurred in the presence of the Child. The 2016 incident of negligent discharge of a handgun, upon which the juvenile court found the Child to be a victim of severe child abuse by Father, speaks to the mental state of Father at the time of the incident. Father acknowledged in his testimony that because of his military training, he was aware of how to secure a weapon in a home at the time of the incident. Furthermore, upon cross-examination by the guardian ad litem, attorney Rachel Kirby ("GAL"), Father reluctantly acknowledged that during the Child's forensic interview following the negligent discharge, the Child stated that Father gave the Child the gun and told the Child to shoot him. Mother's testimony further indicated that Father had exhibited concerning behavior toward the Child:

> But the things that [the Child] has relayed to me in regards to his time with [Father] is – I mean, when he was six years old after we'd even terminated, we went to the lake one day and we pulled up and he was very visibly upset and fidgety, and I asked him what was wrong, and he said, [t]his is the spot where [Father] took me and threatened to drown me.

Additionally, Father was admitted to an emergency room in November 2018 because he presented an altered mental state and had been injecting morphine daily. A progress note from this visit, proffered as an exhibit during trial, described Father as "wildly psychotic." Although Father had been seeking medical treatment for his mental disorders, the trial court referenced Father's inappropriate interjections and responses during testimony as evidence that his conditions persisted.

Following a thorough review of the record, we conclude that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that Father was mentally incompetent to adequately provide for the care and supervision of the Child. Father had a long history of diagnoses that this Court has previously found sufficient for this statutory ground. *See e.g.*, *Smith*, 785 S.W.2d at 337-39; *In re S.M.R.*, 2008 WL 4949236, at *6. These illnesses contributed to Father's history of irresponsible, unpredictable, erratic, and violent behavior. Moreover, this behavior placed the Child at risk of emotional and physical harm through the negligent discharge of a firearm and occurrences of domestic violence in front of the Child. Father's mental conditions persisted at the time of trial, and as the trial court found, were likely to continue, as indicated by Father's statements at trial despite his various attempts at treatment. Therefore, we affirm the termination of Father's parental rights based on the statutory

ground of mental incompetence to adequately provide for the further care and supervision of the Child.

### D.  Persistence of Conditions Leading to the Child's Removal

The trial court also found clear and convincing evidence of the statutory ground of persistence of the conditions leading to the removal of the Child from Father's custody. In regard to this statutory ground, Tennessee Code Annotated § 36-1-113(g)(3) (Supp. 2022) provides:

> (3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i)   The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
>
> (ii)  There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
>
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
>
> (B)  The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

In its final judgment, the trial court stated the following specific findings regarding this statutory ground:

> The Court does find the child had been removed from the physical and legal custody of the Father for a period of six months by order of the Juvenile Court of Warren County. The conditions which led to the removal of the child still persist and other conditions exist which in all probability would

cause the child to be subjected to further abuse and/or neglect, preventing the child['s] safe return to the Father in the near future. There is little likelihood that these conditions will be remedied at an early date so that the child can be returned to the Father in the near future. The continuation of the parent and child relationship greatly diminishes the child's chance of an early integration into a stable and permanent home. The conditions that led to the removal of the child from the home of the Father include the Juvenile Court found the child to be a victim of severe child abuse at the hands of the Father. The severe abuse involved the discharge of a handgun. The Father stated he lived in a home in Florida that he shared with another veteran that he had met through the VA. His explanation for moving to Florida was that he had built a terrible drug habit, was self-destructive and lost his will to live. Father has been diagnosed with post-traumatic stress disorder, traumatic brain injury, depression, bipolar disorder, and anxiety. Father does have a prescription of medical marijuana. When asked if he smoked marijuana daily, Father responded, "Hell, yeah." The Father was admitted to the ER in Rutherford County for shooting up morphine daily and altered mental state. The Father has not had a relationship with the child in the past four years. Therefore, the Father's parental rights are terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(3).

Upon careful review, we determine that a preponderance of the evidence supports the trial court's findings as to this statutory ground. We note that the Child had been removed from Father's custody for far longer than the statutory six-month minimum. Following DCS's filing of a petition alleging dependency and neglect and severe child abuse, the Child was removed from Father's physical and legal custody by the juvenile court's adjudicatory order entered on June 14, 2016. By the time the termination trial began in May 2020, the Child had been in Mother's sole custody for nearly four years.

As found in the juvenile court's June 2016 adjudicatory order, the reason for the Child's removal from Father's custody was that Father had allowed the Child to handle a firearm that had negligently discharged. Beyond whether the conditions leading to the Child's removal persist, the statute also provides that the court should consider whether "other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect. . ." Tenn. Code Ann. § 36-1-113(g)(3)(A). Although Mother and Father each respectively testified that following the negligent discharge incident Father was ordered by the court to have his guns removed, the surrounding conditions that facilitated the incident still persisted at the time of trial, namely Father's history of drug abuse and mental health disorders. Although Father testified that he made substantial changes in these respects as a result of seeking medical treatment and moving to Florida, we agree with the trial court's finding that these steps toward progress were

insufficient to constitute a change in conditions that would make it safe to return the Child to his care.

Concerning the focus of the statutory ground at issue, persistence of conditions, this Court has explained:

> The persistence of conditions ground focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." [*In re Audrey S.*, 182 S.W.3d,] 874 [(Tenn. Ct. App. 2005)]. The goal is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate the ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Thus, the question before the court is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

*In re Kaisona B.*, No. W2020-01308-COA-R3-PT, 2021 WL 4319624, at *6 (Tenn. Ct. App. Sept. 23, 2021). "Under this [persistence of conditions] ground, a parent's inability to eliminate such conditions does not need to be willful." *In re Braden K.*, No. M2020-00569-COA-R3-PT, 2020 WL 5823344, at *9 (Tenn. Ct. App. Sept. 30, 2020) (citing *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012)).

In review of this ground, the focus must be on the results of Father's efforts rather than "the mere fact" that he made those efforts. *See In re Kaisona B.*, 2021 WL 4319624, at *6. Despite the fact that Father has demonstrated an effort to improve these conditions, Father's drug abuse and struggles with mental health, as we previously determined in our analysis of the statutory ground of mental incompetence, are not so improved as to establish that it would be safe for the Child to return to Father's care. It is unlikely these issues will be remedied at an early date so that the Child can be safely returned to Father in the near future.

The evidence also supports the trial court's determination that continuation of the parent-child relationship would greatly diminish the Child's chances of integration into a safe, stable, and permanent home. Despite the fact that Father has sought medical treatment and testimony indicating that he has made some progress, his history of drug abuse; various mental health diagnoses, including post-traumatic stress disorder ("PTSD") and bi-polar disorder; expressed dependence on daily medical marijuana; lack of relationship with the Child in the past four years; and living arrangements in Florida with another veteran he met through his treatment with the Veterans Health Administration all contribute to a

totality of evidence preponderating in favor of this finding. We conclude that the trial court properly terminated Father's parental rights based on clear and convincing evidence of this statutory ground.

### E. Failure to Manifest an Ability and Willingness to Assume Custody of or Financial Responsibility for the Child

The trial court found clear and convincing evidence of the statutory ground of failure to manifest an ability and willingness to assume custody of or financial responsibility for the Child. In regard to this statutory ground, Tennessee Code Annotated § 36-1-113(g)(14) provides:

A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

To establish this ground, Petitioners were required to show by clear and convincing evidence that (1) Father failed to manifest either an ability or willingness to assume custody of or financial responsibility for the Child and (2) returning the Child to Father's custody would pose a risk of substantial harm to the Child's welfare. *In re Neveah M.*, 614 S.W.3d 659, 674, 677 (Tenn. 2020); *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *6 (Tenn. Ct. App. Apr. 23, 2020) ("Under this ground for termination, the petitioner must prove each element by clear and convincing evidence.").

As to the first prong, our Supreme Court has instructed:

[S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*In re Neveah M.*, 614 S.W.3d at 677 (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)). Concerning the "substantial harm" requirement of the second prong, this Court has observed:

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to

precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted in *Maya R.*)).

In its final judgment, the trial court elucidated the following specific findings of fact regarding this statutory ground:

> The Court does find that the Mother has proven by clear and convincing evidence that grounds for termination of the Father's parental rights exist based on the Father's failure to manifest, by act of omission, an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. The Father still resides in Florida. He has a substantial history of mental illness and drug abuse. Although, he was not ordered to pay child support at the time of the parties' divorce, the Father is 100% service connected disabled, and the child receives no VA benefits towards the child's support. The Father has made no efforts to comply with the Juvenile Court's order for therapeutic visitation with the child. The Father has not seen the child since April 2016. The Father has continued to have issues with drug use and altered mental states. He was admitted to the hospital on November 29, 2018, for shooting up morphine daily and altered mental state. Placing the child in the Father's legal custody would pose a risk of substantial harm to the physical or psychological welfare of the child. Therefore, the Father's parental rights are terminated pursuant to § 36-1-113(g)(14).

We agree with the trial court's conclusion concerning this ground. As determined in the previous section of this Opinion addressing the statutory ground of mental incompetence, Father's mental state and drug abuse have rendered him unable to adequately care for the Child. Given Father's history in this regard and his lack of relationship with the Child for nearly four years prior to trial, the evidence supported a finding that Father would not be able to assume legal and physical custody of the Child without a risk of substantial harm to the physical or psychological welfare of the Child. Additionally, Father's failure to comply with supervised therapeutic visitation demonstrates a lack of willingness to assume physical and legal custody of the Child.

The trial court appeared to indicate that because the Child had received none of Father's benefits through the Veterans Benefits Administration ("VA benefits"), Father had failed to show an ability and willingness to provide financial support for the Child. However, the trial court also declined to find that Petitioners had proven the ground of abandonment through failure to support, noting that "[a]t the time of the parties' divorce, neither party was awarded child support" and that "Mother never pursued child support after the Father's visitation was terminated" and "never [pursued] obtaining federal benefits through Father for her son." Father testified that he did not understand why the Child was not receiving federal benefits through him.

Although he has not raised an issue concerning this statutory ground on appeal, Father does assert within his best interest argument that the potential for the Child to receive federal benefits is one reason why it would be in the Child's best interest for Father's parental rights to be maintained. Nonetheless, having determined that Father failed to manifest an ability and willingness to assume physical and legal custody of the Child, we further determine that analysis of Father's ability and willingness to provide financial support is pretermitted as moot when considering this statutory ground. *See* Tenn. Code Ann. § 36-1-113(g)(14) ("A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child . . . ."). The trial court did not err in finding clear and convincing evidence of this statutory ground as well.

## V. Best Interest of the Child

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

The version of Tennessee Code Annotated § 36-1-113(i) (Supp. 2020) in effect when the petition was filed in the instant action listed the following factors for consideration:[2]

(1)    Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)    Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)    Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)    Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)    The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)    Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)    Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

---

[2] Effective April 22, 2021, the General Assembly has amended Tennessee Code Annotated § 36-1-113(i) by deleting the previous subsection in its entirety and substituting a new subsection providing, *inter alia*, twenty factors to be considered in determining a child's best interest in a case involving termination of parental rights. *See* 2021 Tenn. Pub. Acts, Ch. 190 § 1 (S.B. 205). However, because the termination petition in this case was filed prior to the effective date of the amendment, the statutory best interest factors provided in the prior version of the statute are applicable here. *See, e.g.*, *In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As our Supreme Court has explained regarding the best interest analysis:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d at 254.

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts

and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In the instant action, the trial court specifically found regarding these factors:

The Court finds that the Mother has proven by clear and convincing evidence that termination of the Father's parental rights is in the best interests of the child based on the following findings of fact.

1.    The Father has failed to demonstrate a lasting adjustment of circumstances, conduct, or conditions to make [it] safe and beneficial for the child to be in the home of the Father. The Father lives in Florida with a man that he met through the Veteran's Administration. He has continued to have issues with drug use and mental illness. The Father has been hospitalized for shooting up morphine daily. The Father has a prescription for medical marijuana and admits to using marijuana on a daily basis. Father has a diagnosis of PTSD, traumatic brain injury, depression, bipolar disorder, and anxiety. The Father continues to make lifestyle choice[s] that prevent him from being able to parent the child or to provide a home for the child. Termination of the Father's parental rights will have a positive impact on the Child's critical need of stability. The Child is and has been stable while living with his Mother and Stepfather.

2.    The Father has failed to effect a lasting adjustment after reasonable efforts by social services. The child was removed from the Father's

custody by a Petition for Dependency and Neglect filed in the Juvenile Court of Warren County. The father was given supervised therapeutic visits through Kymari House, by order entered on December 12, 2016. The father did not follow through on setting up the therapeutic visits. The child has not seen the Father since April 2016.

3. The Father has not maintained regular visitation with the child. Although, the Father could have set up supervised therapeutic visits through Kymari House, when told he would need a court order to set visits up, he did not follow through. The child has not seen the Father since April 2016.

4. The Father has not had visitation with the child since April 2016. It is not a reasonable expectation that the Father would create a secure and healthy relationship with the child.

5. The child's mother and stepfather have been together since the child was 3 years old. The stepfather is involved in the child's extracurricular activities and has established a parent-child relationship with the child. The child is bonded with his stepfather. The stepfather wishes to adopt the child. The termination of the Father's parental rights will not negatively impact the child.

6. The Father has shown severe child abuse or neglect towards the child. On June 14, 2016, the Juvenile Court of Warren County, Tennessee, found by clear and convincing evidence that the child was a victim of severe child abuse perpetrated by Father. The Father allowed the child to handle a pistol, which resulted in the child accidentally shooting the Father.

7. The Father has failed to create a home that is health[y] and safe for the child. The Father is disabled and lives in Florida with a man he met through the Veteran's Administration. Father also has a history of violence. Although the Father has a prescription for medical marijuana which he states he uses daily, the Father has had a morphine and oxycodone issue in the past.

8. The mental [and/or] emotional status of the Father would be detrimental to the child and/or prevent him from consistently and effectively providing safe and stable care and supervision for the child. The Father has a diagnosis of PTSD, traumatic brain injury,

depression, bipolar disorder, anxiety, and history of substance abuse. The Father is 100% service connected disabled. He has erratic behavior and outbursts. During this court proceeding the Father spoke out to the Mother saying, "You've got one shot, make it good."

9.    Although the Father was not ordered to pay child support in the parties' divorce, he has not paid or offered to pay any child support since Warren County Juvenile Court terminated his visits. Also, the child has not received any benefits towards his support from the Father through Veteran Administration benefits.

The Court finds that the Mother has proven by clear and convincing evidence that grounds for termination of the Father's parental rights exist and has proven by clear and convincing evidence that it is in the best interests of the child that all the parental rights of the Father be forever terminated. Placing the child in the custody of the Father would pose a risk of substantial harm to the physical and psychological welfare of the child. It is in the best interest of the child for the Father's rights to be terminated and the stepfather be allowed to adopt the child.

Although the trial court did not expressly state the weight it was affording each factor, the court appears to have weighed all nine factors against maintaining Father's parental rights. Upon a thorough review of the record and applicable authorities, we concur with the trial court's determination that termination of Father's parental rights was in the Child's best interest.

In contending that the trial court erred in its consideration of the best interest factors, Father attempts to raise a separate issue regarding the first two factors, arguing that the court failed to attach significant weight to Father's adjustment of circumstances since the dependency and neglect proceedings. Recognizing that Father has highlighted these two factors as particularly significant, we will nonetheless proceed to review the totality of the trial court's analysis of the best interest factors. *See In re Gabriella D.*, 531 S.W.3d at 682 ("Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors . . . .").

Regarding the first statutory factor, the trial court found that Father's drug use, mental health status, and failure to visit the Child indicated that Father had not made a lasting adjustment of circumstance, conduct, or conditions as to make it safe and in the Child's best interest to be in his home. Concerning factor two, the court also found that despite being "given supervised therapeutic visits through Kymari House" through the

juvenile court's December 2016 order, Father had failed to take advantage of the visitation offered and thus had failed to see the Child since April 2016. We recognize that this is not a case wherein DCS or another agency has continued to offer services to the parent or where the reasonableness of an agency's efforts may be measured. Analysis under factor two is therefore limited to the initial provision for supervised therapeutic visitation that Father undisputedly did not utilize. Furthermore, because the trial court's findings regarding factors one and two partially involve Father's lack of visitation with the Child and resultant lack of a meaningful relationship with the Child since the dependency and neglect proceedings, some overlap exists among factors one, two, three, and four.

Father argues that his failure to visit the Child was due to the court order preventing him from doing so and that the trial court should have ascribed more weight to his November 2018 attempt by petition to reinstate supervised visitation with the Child. However, having determined this argument to be unavailing within our analysis of the statutory ground of abandonment through failure to visit, we further determine this argument to be unpersuasive as related to the Child's best interest. To undergird his argument, Father relies on this Court's decision in *In re Chelbie F.*, No. M2006-01889-COA-R3-PT, 2007 WL 1241252, at *1-2 (Tenn. Ct. App. Apr. 27, 2007), claiming it is "very much on point" with the instant action. We disagree.

In *Chelbie F.*, the father had not seen or visited the child in seven years when he filed a petition to reinstate visitation and support. *In re Chelbie F.*, 2007 WL 1241252, at *1. As the father's petition was pending, the mother filed a petition to terminate the father's parental rights. *Id.* On appeal, this Court concluded that because the father was "actively pursuing a judicial resolution of visitation and support during the four months immediately preceding the filing of the termination petition," the mother had not provided clear and convincing evidence that the father had abandoned the child. *Id.* The case at bar is factually distinguishable because the father in *Chelbie F.* was actively pursuing the petition to reinstate visitation when he was preempted by the termination petition. *See id.*

Here, Father had filed his petition in the incorrect court, and it was subsequently dismissed due to lack of subject matter jurisdiction prior to Mother's filing of the termination petition. Father pursued no further legal action to reestablish visitation. As previously addressed, our Supreme Court rejected a similar argument in *Adoption of Angela E.*, 402 S.W.3d at 642. In determining that the filing of a petition to reinstate visitation without subsequent action did not suffice to negate an allegation of abandonment through failure to visit, the High Court distinguished such a situation from that in *In re Chelbie F.*, upon which the father in *Angela E.* had partially relied. *Id.* (citing *In re Chelbie F.*, 2007 WL 1241252, at *6). Furthermore, in this case, Father claims that he waited until November 2018 to petition for reinstatement of visitation because he felt that he had made enough progress at that time to reenter the Child's life. However, fifteen days after filing

said petition, Father was admitted to an emergency room for an altered mental state and "shooting up morphine daily," evincing that he was not ready to reenter the Child's life at that time.

Father also relies on this Court's decision in *In re Aryana S.,* No. E2019-01267-COA-R3-PT, 2020 WL 2569744, at *34-35 (Tenn. Ct. App. May 21, 2020), claiming the evidence presented and facts found in support of the first two factors are similar to that in his case. We also find *Aryana S.* to be highly factually distinguishable from the instant action. This Court in *Aryana S.* affirmed the trial court's finding that a mother with a history of substance abuse had made a lasting adjustment by seeking treatment, becoming "sober," no longer associating with inappropriate people, going back to school, and acquiring suitable housing and transportation. *Id.* at *13. However, *Aryana S.* is distinguishable because in *Aryana S.*, "the entire reason for the removal of the child in the first place was that of [Mother's] drug use and its sequelae." *See id.* at *3. In contrast, the Child in the case at bar was removed from Father's custody due not only to his substance abuse, but also his mental health issues and the culminating incident when Father placed the Child in danger by handing him a loaded gun. Additionally, the mother in *Aryana S.* had abused drugs while pregnant with the child and had quit doing so shortly following the child's birth and removal from her custody. *Id.* at *13. Here, Father testified to having used morphine and oxycodone until November 2019, long after the Child's removal from his care.

In further support of his postulate that the changes in his life indicated a lasting adjustment enabling him to care for the Child, Father relies upon this Court's decision in *In re Serenity W.,* No. E2018-00460-COA-R3-PT, 2019 WL 511387 (Tenn. Ct. App. Feb. 8, 2019), urging that the adjustments he made in his life are comparable to that of the mother in *Serenity W.* In *Serenity W.,* this Court reversed the trial court's termination of the mother's parental rights upon concluding, *inter alia*, that the following evidence preponderated in favor of a finding of a lasting adjustment of circumstances by clear and convincing evidence: at the time of trial the mother was drug free, living with her grandparents, employed, exhibiting no indication of an unsafe home, and was participating in intensive outpatient drug treatment, medication management, and mental health therapy. *In re Serenity W.*, 2019 WL 511387, at *8. Furthermore, this Court noted that the mother had made these changes with limited assistance from DCS. *Id.* The *Serenity W.* Court determined that although the mother's sobriety was of short duration and the mother could relapse, as she had done before, the Court could not conclude that a lasting adjustment did not reasonably seem possible because the mother had a strong support system with her grandparents who monitored her progress and provided her with transportation and housing. *Id.*

Although Father in this case had sought medical treatment for his drug abuse and mental health issues, and testified that he had not used oxycodone or morphine since November 2019, substantial factual differences remain between his situation and that of the mother in *Serenity W.* The *Serenity W.* mother had taken action after having her visitation rights terminated by complying with drug testing, attending sixty percent of her scheduled visits with the child, and exhibiting appropriate behavior with the child. *Id.* In this case, Father failed to schedule supervised visitation with the Child at Kymari House, and after his visitation rights had been suspended, Father failed to take appropriate or sufficient action to reinstate visitation with the Child. Additionally, the trial court found that Father's inappropriate outbursts and statements during his trial testimony revealed that his mental health issues persisted and were not likely to be remedied in the future. In further contrast, the mother in *Serenity W.* had developed a strong support system by residing with her grandparents, who drove her to appointments and monitored her progress daily, whereas Father's family support system remained in Tennessee while he resided in Florida. *See id.* at *3. We determine that the evidence under our review does not preponderate against the trial court's findings regarding factors one and two.

As noted above, the trial court's findings regarding Father's failure to pursue reinstatement of his visitation also impacted the court's analyses of factors three and four. Specifically concerning factor four, Father argues that the trial court erred by failing to consider that a meaningful relationship once existed between Father and the Child. We discern no error in the trial court's consideration of this factor. The fourth best interest factor concerns whether a meaningful relationship between the Child and parent "has been established" at the time of trial, not if one had ever existed in the past. *See* Tenn. Code Ann. § 36-1-113(i)(4); *see, e.g.*, *In re Jude M.*, 619 S.W.3d 224, 248-49 (Tenn. Ct. App. 2020) (determining that although a meaningful relationship existed at one time between the mother and the child, due to a lack of contact, a meaningful relationship no longer remained at the time of trial and weighed against maintaining the mother's parental rights to the child); *In re Dylan S.*, No. E2018-02036-COA-R3-PT, 2019 WL 5431878, at *4 (Tenn. Ct. App. Oct. 23, 2019) ("An absence of contact between a parent and child for an extended period of time can lead to, in effect, the 'death' of the relationship." (quoting *In re Joshua S.*, No. E2010-01331-COA-R3-PT, 2011 WL 2464720, at *16 (Tenn. Ct. App. June 16, 2011))). Father himself testified that he had not seen the Child since April 2016 and acknowledged that he no longer had a meaningful relationship with the Child. We conclude that the evidence preponderates in favor of a finding that factors three and four weigh against maintaining Father's parental rights.

Apart from the first four factors involving Father's purported adjustment in circumstances, visitation, and relationship with the Child, Father focuses on two points not listed as statutory best interest factors, emphasizing that, pursuant to Tennessee Code Annotated § 36-1-113(i), the trial court is "not limited to" consideration of the nine

delineated factors. Father maintains that the trial court should have weighed in his favor (1) the Child's relationships with his paternal aunt ("Aunt") and paternal grandmother ("Grandmother") and (2) the potential for the Child to receive significant monetary VA benefits and Social Security dependent benefits through his relationship to Father. We will address each of these arguments in turn.

In its final order, the trial court stated that it considered Grandmother's and Aunt's respective testimonies along with all of the other evidence. The court did not make a specific finding concerning the impact of the Child's relationships with Grandmother and Aunt on the Child's best interest. As noted in *Kenneth D. I*, "Mother testified that she allowed [Aunt] to have overnight, weekend visits '[e]very other week or so' from 2017 until November 2019," "condition[ing] the visits on Father not being informed of the timing of the visit and on there being no contact with Father while the child was present." 2022 WL 556739, at *2. During trial, Aunt acknowledged that she did not have a legal right to visitation with the Child. Aunt articulated that she had not been allowed to visit with the Child since November 2019 after she had a conversation with the Child prompted by the Child's expression of excitement over the prospect of a potential change in the Child's name. Aunt described what she had told the Child:

> Once I told [the Child], once again, that he would not be adopted until the judge signed the papers and that his real daddy would never give up on trying to fight for him, he went home—and I explained to him, I said, you are a big boy and you make big boy choices. When you go home and tell your mother what we've discussed about your big boy choices, she will not let you come back. I said, but that is your decision.

For her part, Grandmother testified that during 2017 to 2018, she had been able to see the Child when he would visit Aunt. She added that she had relocated to Florida in July 2019 to assist Father while he settled there but that she had moved back to Tennessee in February 2020 to be near the Child, who is her only grandchild. Grandmother acknowledged, however, that she had not been able to see the Child since June or July of 2019. Both Aunt and Grandmother expressed love for the Child, and each stated that she believed she had a good relationship with the Child.

In considering Father's argument regarding the Child's relationships with Aunt and Grandmother, we recognize that this is a difficult and painful situation for Father's extended family. We note also that within the amended statutory best interest factors as applicable to termination petitions filed beginning April 22, 2021, the following factor is provided:

Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage[.]

Tenn. Code Ann. § 36-1-113(i)(I) (Supp. 2022). Although the amended statutory factors are not applicable to the instant action, the legislature's subsequent inclusion of this factor concerning a child's relationships with persons other than parents and caregivers is instructive insofar as it indicates that such a consideration would be appropriate under the prior version of the statute. In this instance, we find that Aunt's testimony in particular reflected a strained relationship with Petitioners that had placed the Child in the middle of a highly stressful situation. To the extent that the trial court may not have fully considered the effect of terminating Father's parental rights on the Child's relationships with Aunt and Grandmother, we determine the error to have been harmless given the constellation of circumstances and the trial court's overwhelming findings that the statutory factors weighed against maintaining Father's parental rights to the Child.

Father also posits that the trial court erred by failing to give sufficient weight to the Child's potential for receiving VA benefits and Social Security dependent benefits (collectively, "federal benefits") through his relationship with Father. In considering factor nine, whether Father had paid child support, the court found that the Child had never received any federal benefits through Father and that Mother had not pursued obtaining such benefits for the Child. The court did not make an express finding regarding the impact on the Child's best interest of there being no future possibility for the Child to obtain benefits once Father's parental rights were terminated and the Child was adopted by Stepfather. *See* 38 CFR § 3.458(d) (1986) ("Veteran's benefits will not be apportioned . . . [w]here the child of the disabled person has been legally adopted by another person."); *see also State ex rel. Bass v. Gonzalez-Perez*, No. W2016-00655-COA-R3-JV, 2017 WL 2210758, at *9 n.3 (Tenn. Ct. App. May 19, 2017).

In support of his argument, Father relies on *In re Grace Y.*, No. M2007-01607-COA-R3-PT, 2014 WL 4930784, at *8 (Tenn. Ct. App. Sept. 30, 2014), claiming that this Court's analysis placing value on the child's ability to receive federal benefits demonstrates that this consideration should weigh in favor of maintaining his parental rights. We find *Grace Y.* factually distinguishable because one of the prospective adoptive parents in *Grace Y.*, the child's paternal step-grandfather, was the party able to provide federal benefits to the child. *Id.* Furthermore, the father against whom termination was sought provided no financial support to the child, and the child's paternal grandmother, who maintained custody of the child, testified that without the step-grandfather's benefits, it would be difficult to continue financially providing for the child's needs. *Id.* In the instant action, Petitioners have provided for all of the Child's financial needs since Mother's and Father's

divorce, and Mother has not pursued Father's federal benefits for the Child. Mother testified that Petitioners would provide for all of the Child's future financial needs as well.

We emphasize that "[t]he relevancy and weight to be given each factor depends on the unique facts of each case." *In re Audrey S.*, 182 S.W.3d at 878. The facts and circumstances surrounding *Grace Y.* weighed more heavily in favor of consideration of the federal benefits because those benefits were needed to provide financial stability to the child. *In re Grace Y.*, 2014 WL 4930784, at *8. In this case, although Father's federal benefits could potentially be utilized for the Child, Mother has demonstrated the ability to support the Child without access to those benefits. Therefore, Father's federal benefits do not weigh as heavily in the best interest analysis in this case as in *Grace Y.*

However, although we do not discern error in the trial court's consideration of the Child's potential to receive federal benefits through Father, we do conclude that given the court's findings that Father did not abandon the Child through failure to pay child support and that Mother had actively resisted pursuing benefits through Father, factor nine should have been weighed neither for nor against terminating Father's parental rights.[3] We note that in its final order, the trial court did not expressly state a conclusion as to how factor nine should be weighed. To the extent that the court weighed this factor against Father, we conclude that such error was harmless given the totality of the best interest analysis.

Father advances no arguments against the trial court's findings in regard to factors five, six, seven, and eight. In determining that factor five weighed against maintaining Father's parental rights to the Child, the trial court determined that the Child enjoyed a healthy home environment and strong relationships with both Mother and Stepfather. As to factor six, the court determined that the juvenile court's finding of severe child abuse weighed in favor of terminating Father's parental rights to the Child. We determine that the evidence does not preponderate against the trial court's findings as to these two factors.

Concerning factors seven and eight, the trial court found that Father's current living arrangements, history of violence, history of drug use, and mental health status weighed against maintaining Father's parental rights to the Child. We determine that the evidence does not preponderate against the trial court's findings as to these two factors as well.

In sum, we affirm the trial court's findings that factors one, two, three, four, five, six, seven, and eight weigh against maintaining Father's parental rights to the Child. However, we further conclude that insofar as the trial court found factor nine to weigh

---

[3] Father further argues that Mother demonstrated an antipathy toward him that trumped her concern for the Child's best interest when she declined to pursue obtaining federal benefits for the Child through an apportionment of his VA benefits and potential for Social Security dependent benefits. In the full context of the best interest analysis, we find this argument to be unavailing.

against preserving Father's parental rights and declined to fully consider the effect of terminating Father's parental rights on the Child's relationships with Aunt and Grandmother, these errors were harmless because overall the best interest analysis weighed against maintaining Father's parental rights to the Child. We note especially the importance in this case of Father's lack of readiness to assume custody of the Child, the lack of meaningful relationship between Father and the Child, and the deleterious effect a change of caretakers and physical environment would likely have on the Child's emotional and psychological condition. *See In re Gabriella D.*, 531 S.W.3d at 682 (holding that a trial court "must consider all of the statutory factors" while also explaining that "the circumstances of a particular case" may "ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor").

Based on our thorough review of the evidence in light of the statutory factors, we conclude that the evidence presented does not preponderate against the trial court's determination by clear and convincing evidence that termination of Father's parental rights was in the best interest of the Child. Having also determined that statutory grounds for termination were established, we affirm the trial court's termination of Father's parental rights to the Child.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's judgment in all respects, including the termination of Father's parental rights to the Child. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Father's parental rights and collection of costs assessed below. Costs on appeal are assessed to the appellant, Kenneth D., II.

s/ Thomas R. Frierson, II_____
THOMAS R. FRIERSON, II, JUDGE